## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS W. GREENWOOD, individually and on behalf of all others similarly situated, ) ) ) | **CIVIL ACTION NO**.: |
| Plaintiff, ) ) | |
| v. ) ) | **CLASS ACTION COMPLAINT** |
| ANTONIO M. PEREZ, RICHARD S. BRADDOCK, HERALD Y. CHEN, ADAM H. CLAMMER, TIMOTHY M. DONAHUE, MICHAEL J. HAWLEY, WILLIAM H. HERNANDEZ, DOUGLAS R. LEBDA, KYLE P. LEGG, DELANO E. LEWIS, WILLIAM G. PARRETT, JOEL SELIGMAN, DENNIS F. STRIGL, LAURA D'ANDREA TYSON, DEBRA L. LEE, SAVINGS AND INVESTMENT PLAN COMMITTEE, FRANK S. SKLARSKY, ANTOINETTE P. McCORVEY, PAUL DILS, and DOES 1-10, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) ) | |

Plaintiff Thomas W. Greenwood ("Plaintiff") has been  an employee of the Eastman Kodak Company ("Kodak" or the "Company") and a participant, during the Class Period alleged below, in the Eastman Kodak Employees' Savings And Investment Plan  (the "SIP" or the "Plan") and the Kodak Employee Stock Ownership Plan (the "ESOP"; collectively with the SIP, the "Plans").   Plaintiff, individually and on behalf of all others similarly situated,  based on personal knowledge as to Plaintiff's own conduct and on information and belief as to the acts of others, alleges as follows on behalf of the Plan and the ESOP:

## INTRODUCTION

1.      This is a class action brought pursuant to Sections 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries.

2.      Plaintiff was a participant in the Plans during the Class Period, during which time the Plans held interests in the common stock of Kodak.  Plaintiff's individual  accounts in the Plans included Kodak stock during the Class Period.

3.      Retirement plans such as the Plans confer tax benefits on participating employees to incentivize them to save for retirement.  An employee participating in such plans  may, under appropriate circumstances, have the option of purchasing the common stock of his or her employer, which is often the plan sponsor.  Common stock of Kodak was one of the investment alternatives offered in the SIP throughout the Class Period.  Further, Kodak stock was the principal investment vehicle in the ESOP.

4.      Defendants, as the Plans' fiduciaries, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to the Plans and to the participants and beneficiaries of the Plans in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plans' holdings of Kodak common stock.

5.      Count I below alleges that certain Defendants, each bearing  responsibilities regarding the management and investment of the Plans' assets, breached their fiduciary duties to Plaintiff, the Plans and the proposed Class by failing to prudently and loyally manage the Plans' investment in Company common stock: (a) by continuing to offer Kodak common stock as an investment option for the Plans when it was imprudent to do so; (b) by failing to provide complete and accurate information to participants in the Plans regarding the Company's dire financial condition and the extreme risk  of investing in Company stock as the Company spiraled

toward bankruptcy; and (c) by maintaining the Plans' overconcentration investment in Kodak stock when the Company's stock was no longer a prudent investment for the Plans.  By their conduct, Defendants acted directly contrary to the purpose of ERISA retirement plans, which is to provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.     On January 19, 2012, Kodak filed for Chapter 11 bankruptcy protection. Throughout the Class Period, in breach of fiduciary duty, Defendants failed to take any effective or material action to protect the Plans and their participants in view of the Company's impending bankruptcy.

7.     Count II below alleges that certain Defendants breached their fiduciary duties by failing adequately to monitor persons to whom they delegated management and administration responsibilities with respect to the Plans' assets.  They did so despite the fact that they knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Kodak stock as an investment option and imprudently continuing to invest the Plans' assets in Kodak stock.

8.     Count III below alleges that certain Defendants breached their fiduciary duties by failing to avoid or ameliorate inherent conflicts of interests that crippled their ability to function as independent, "single-minded" fiduciaries with only the Plans' and their participants' best interests in mind.

9.     Defendants allowed investment of the Plans' assets in Kodak stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent due to the following facts, as explained below in detail:  (a) the Company was saddled

with out of date   technology and   antiquated product offerings; (b) the Company lacked the ability   to to market   new products   quickly enough to stem the Company's decline and impending collapse; (c) the Company was unable to generate sufficient cash-flow from its short term business model focused on litigation; and (d) the Company was suffering from a liquidity crisis.  As a result of these dire circumstances, continued investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plans and the Plans' participants.

10.     This action, brought on behalf of the Plans, seeking recovery for  losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiff's claims apply to the Plans,  and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plans for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this lawsuit as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     Venue is proper in this district pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2).

## PARTIES

13.     Plaintiff is a participant in the Plans, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and has held Kodak shares in his accounts in the Plans during the Class Period.

14.     Defendant Antonio M. Perez ("Perez") has served on the Board of Directors since October 2004.  He joined Kodak in April 2003 as the Company's President and Chief Operating Officer.  In May 2005, Perez became the Company's Chief Executive Officer and in December

of that same year he was elected Chairman of the Board of Directors.  During the Class Period, Perez was a fiduciary of the Plans.

15.     Defendant Richard S. Braddock ("Braddock") has served on the Board of Directors since May 1987.  During the Class Period, Braddock was a fiduciary of the Plans.

16.     Defendant Herald Y. Chen ("Chen") has served on the Board of Directors since September 2009.  During the Class Period, Chen was a fiduciary of the Plans.

17.     Defendant Adam H. Clammer ("Clammer") has served on the Board of Directors since September 2009.  During the Class Period, Clammer was a fiduciary of the Plans.

18.     Defendant Timothy M. Donahue ("Donahue") has served on the Board of Directors since October 2001.  During the Class Period, Donahue was a fiduciary of the Plans.

19.     Defendant Michael J. Hawley ("Hawley") has served on the Board of Directors since December 2004.  During the Class Period, Hawley was a fiduciary of the Plans.

20.     Defendant William H. Hernandez ("Hernandez") has served on the Board of Directors since February 2003.  During the Class Period, Hernandez was a fiduciary of the Plans.

21.     Defendant Douglas R. Lebda ("Lebda") has served on the Board of Directors since November 2007.  During the Class Period, Lebda was a fiduciary of the Plans.

22.     Defendant Kyle P. Legg ("Legg") began serving on the Board of Directors in September 2010.  During a portion of the Class Period, Legg was a fiduciary of the Plans.

23.     Defendant Delano E. Lewis ("Lewis") has served on the Board of Directors since July 2001.  During the Class Period, Lewis was a fiduciary of the Plans.

24.     Defendant William G. Parrett ("Parrett") has served on the Board of Directors since November 2007.  During the Class Period, Parrett was a fiduciary of the Plans.

25.     Defendant Joel Seligman ("Seligman") has served on the Board of Directors since July 2009.  During the Class Period, Seligman was a fiduciary of the Plans.

26.     Defendant Dennis F. Strigl ("Strigl") has served on the Board of Directors since February 2008.  During the Class Period, Strigl was a fiduciary of the Plans.

27.     Defendant Laura D'Andrea Tyson ("Tyson") has served on the Board of Directors since May 1997.  During the Class Period, Tyson was a fiduciary of the Plans.

28.     Defendant Debra L. Lee ("Lee") served on the Board of Directors from 1999 until 2011.  During a portion of the Class Period, Lee was a fiduciary of the Plans.

29.     Defendants Perez, Braddock, Chen, Clammer, Donahue, Hawley, Hernandez, Lebda, Legg, Lewis, Parrett, Seligman, Strigl, Tyson, and Lee are hereafter collectively referred to as the "Director Defendants."

30.     The Savings and Investment Plan Committee ("SIPCO") was the Plan Administrator and named fiduciary of the Plan.

31.     Frank S. Sklarsky ("Sklarsky") served as the Chair of SIPCO for a portion of the Class Period.  As the Chair of SIPCO, Sklarsky signed the Plan's Form 11-K filed with the Securities and Exchange Commission for the year ending December 31, 2009.  Further, Sklarsky was the Company's Chief Financial Officer ("CFO") from November 13, 2006 until his departure from Kodak in November 2010.

32.     Antoinette P. McCorvey ("McCorvey") joined Kodak in 1999.  For a portion of the Class Period,  McCorvey served as the Chair of SIPCO.  As the Chair of SIPCO, McCorvey signed the Plan's Form 11-K filed with the Securities and Exchange Commission for the year ending December 31, 2010.  In addition to her position as Chair of SIPCO during a portion of the Class Period, McCorvey has served as Kodak's CFO since November 5, 2010, when she

replaced Sklarsky.  Prior to becoming the Company's CFO,  McCorvey has held numerous positions within Kodak including, Director & Vice President of Investor Relations and Corporate Vice President.

33.     Defendants Sklarsky and McCorvey, each of whom was a fiduciary of the Plans for at least part of the Class Period, are hereafter referred to as the "SIPCO Defendants."

34.     Paul Dils ("Dils") served as a Plan Administrator for ESOP for a portion of the Class Period.  As Plan Administrator for the ESOP, Dils signed the ESOP's Forms 5500 filed with the Internal Revenue Service for year ending December 31, 2009,  and the year ending December 31, 2010. During at least a portion of the Class Period, he was a fiduciary of the Plans.

35.     The Doe Defendants include members of SIPCO whose  identities  are currently unknown to Plaintiff.  Plaintiff reserves the right, once their identities are ascertained, to seek leave to join such  SIPCO members to the instant action, along with as any other officers, directors and employees of Kodak who were fiduciaries of the Plans during the Class Period.

### THE SIP

36.     The SIP is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A), and it is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to, and and any income, expenses, gains and losses allocated to, each such participant's account.

37.     The Plan is made available to certain employees of Kodak and certain of its subsidiaries operating in the United States.  *See* Form 11-K for fiscal year ending December 20,

2010, filed with the Securities and Exchange Commission on or about June 23, 2011 ("2010 Form 11-K").

38.     The Plan is sponsored by Kodak and administered by the Company through SIPCO.  *Id.*

39.     The Plan purchased shares of Kodak common stock and held it in a trust for allocation to eligible participants' accounts.

40.     Regular full-time, regular part-time, supplementary or conditional employees of the Company are eligible to participate in the Plan upon their date of hire.  *Id.*

41.     Allocations of Company stock are based on a participant's earnings or account balances, as defined in the Plan document.

42.     The Plan permits employees to participate in the Plan through a salary reduction provision, thereby allowing eligible employees to defer a certain percentage of their eligible compensation to the Plan.  For Plan year 2010, the maximum deferral was 75% of aggregated eligible salary and certain related incentive compensation.  *Id.*

43.     Participants are permitted to direct their Plan investments in 1% increments into various investment options offered under the Plan, including common collective trusts, a self-directed brokerage account, and a Kodak stock fund (which is invested primarily in Kodak common stock).  *See* 2010 Form 11-K.

44.     As of January 1, 2000, Kodak began to match an employee's Plan contributions in an amount up to 3% of wages for an employee who contributed up to 5% of his or her wages to the Plan and who also participated in the Cash Balance Plus portion of the Kodak Retirement Income Plan.  Effective January 1, 2009, the Company suspended its matching contributions to the Plan.  The Company reinstated the matching contribution effective January 1, 2010.  *Id.*

45.     Participants are immediately vested in their contributions, Company matching contributions, and actual earnings.  *Id.*

46.     The Plan's trust is administered by BNY Mellon Financial Corporation ("Plan Trustee") and the Plan's record-keeper is T. Rowe Price Retirement Plan Services, Inc. ("T. Rowe Price").  *Id.*

47.     As of December 30, 2010, the Plan held over $30.2 million in Kodak stock.  *Id.*

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plans, himself and the following class of similarly situated persons:

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Eastman Kodak Employees' Savings And Investment Plan and/or the Kodak Employee Stock Ownership Plan at any time between January 1, 2010 and the present (the "Class Period") and whose  accounts included investments in Kodak common stock (the "Class").

49.     The members of the Class, which is estimated to number in the thousands, are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, it can easily be ascertained through discovery.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

(a)     whether Defendants each owed a fiduciary duty to the Plans, Plaintiff and members of the Class;

(b)     whether Defendants breached their fiduciary duties to the Plans, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and beneficiaries;

9

(c)     whether Defendants violated ERISA; and

(d)     whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plans and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained competent counsel experienced in class actions and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plans or the Class.

53.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

54.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

55.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plans, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

56.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

57.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

58.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plans because:

        (a)     they were so named; and/or

        (b)     they exercised authority or control respecting management or disposition of the Plans' assets; and/or

        (c)     they exercised discretionary authority or discretionary control respecting management the Plans; and/or

        (d)     they had discretionary authority or discretionary responsibility in the administration of the Plans.

59.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the

interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

60.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

61.     Instead of delegating all fiduciary responsibility for the Plans to external service providers, Kodak chose to assign the appointment and removal of fiduciaries to themselves.

62.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plans' sponsor.

63.     During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

64.     Upon information and belief, the fiduciaries of the Plan were also fiduciaries of the ESOP.

## THE FIDUCIARY STATUS OF THE DIRECTOR DEFENDANTS

65.     As described above, each of the Director Defendants served as  directors of Kodak during the Class Period.  *See* Kodak Definitive Proxy Statement, filed with the SEC on March 30, 2011.

66.     The Director Defendants were responsible for the appointment of members to SIPCO.  *See* Plan, Section 3.01.

67.     Further, the Board of Directors was responsible for monitoring the activities of SIPCO in that the "Board may at any time remove a member of SIPCO and appoint a successor." *Id.*

68.     Consequently, the Director Defendants bore ultimate responsibility for appointing, monitoring and, if necessary, removing Company officers/employees' delegated duties with respect to the administration and management of the Plans and management of the Plans' assets, including members of SIPCO.

69.     As such, the Director Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plans' assets.

## THE FIDUCIARY STATUS OF THE SAVINGS AND INVESTMENT PLAN COMMITTEE

70.     According to the Plan, SIPCO is the "Named Fiduciary and Plan Administrator as those terms are used in ERISA."  *See* Plan, Section 3.02.

71.     These Company officers/employees were appointed by the directors of Kodak and were delegated the day-to-day responsibility for the administration of the Plan and the management of the Plan's assets.

72.     SIPCO was responsible for "appointing and removing the Trustee and for administering the Plan…"  *See* Plan, Section 3.10.

73.     The members of SIPCO were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with

respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

## FIDUCIARY RESPONSIBILITIES WITH RESPECT TO THE DUTY OF LOYALTY AND CANDOR

74.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the Plans and their participants that includes the duty to speak truthfully to the Plans and their participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly to allow others to materially mislead, plan participants and beneficiaries.

75.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured.

76.     During the Class Period, upon information and belief, certain Defendants made direct and indirect communications with the Plans' participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, the Plans' documents (including Summary Plans Descriptions ("SPDs")), account statements, and/or prospectuses, which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, the Company's SEC filings were incorporated into and part of the SPDs, and/or a prospectus and/or any applicable SEC Form S-8 registration statements.  Defendants also acted as fiduciaries to the extent of this activity.

77.     Further, as set forth below, certain Defendants made direct statements to the Plans' participants regarding the viability and future of the Company and, thus, concomitantly the prudence of continued investment in Kodak securities.  These communications were made in

town-hall meetings with employees and memos to Company employees.  Defendants also acted as fiduciaries to the extent of this activity.

78.     Moreover, Defendants, as the Plans' fiduciaries, knew or should have known certain facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, that encourage investment in the company stock option where it is included as an alternative for 401(k) investment..

79.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plans' funds in Company stock, they still took no action to protect the Plans' assets from their imprudent investment in Company stock.

## SUBSTANTIVE ALLEGATIONS

80.     Kodak is headquartered in Rochester, New York.  The Company provides worldwide imaging technology products and services the photographic and graphic communications markets.  It operates three business segments: Consumer Digital Imaging Group ("CDG"), Graphic Communications Group ("GCG"), and Film, Photofinishing, and Entertainment Group ("FPEG").  On January 19, 2012, the Company filed for Chapter 11 bankruptcy reorganization.

81.     Throughout the Class Period, Defendants knew or should have known that Kodak stock was an imprudent Plan investment, because the Company: (a) was suffering from a dying technology and was tethered to the sale of antiquated products no longer sought by the consumer; (b) was unable to bring new products to the market fast enough to counter the rapidly declining profits from the sales of its antiquated products; (c) was unable to generate sufficient cash-flow from its short term business strategy of initiating lawsuits, which would presumably garner settlements, to maintain the Company's cash flow; (d) was suffering from a liquidity crisis; (e) as a consequence of the above, the Company's stock price had utterly collapsed; and

(f) heavy investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plans and, consequently, to the Plans' participants.

82.     Defendants could not have acted prudently when they continued to permit the Plans to invest in Company stock and maintained the Plan's existing investments in Company stock.  As a consequence of the below-described facts, Defendants knew or should have known that Company stock was an imprudent investment for the Plans.  Their fiduciary duties notwithstanding, Defendants failed to protect the Plans' participants' retirement savings from being imprudently invested in Company stock, and as a result, the Plans, and ultimately their participants, suffered losses.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plans lost tens of millions of dollars.

## A.     __History of Kodak__

83.     The Company was founded in 1880 by George Eastman.  That year, he quit his bank job to perfect his method of photographic development.

84.     Rather than rely on heavy glass plates, which was – at the time -- a standard piece of equipment in photographic development, George Eastman developed a flexible cellulose film he sold preloaded into cameras.

85.     He named the Company Kodak because he thought the letter "K" was "strong and incisive."  With the Company's brand letter "K" framed in yellow, Kodak's symbol quickly became one of the most recognizable brand names on the planet.

86.     In 1900, Kodak released the $1 Brownie camera.  With the ease of Brownie's point-and-shoot technology, Eastman turned photography into an overnight craze.

87.     The Company's business model was to give away cameras in exchange for getting people hooked on having to pay to have their photos developed.

88.     By 1927, Kodak had a near monopoly on the U.S. photographic industry.

89.     Eventually, Kodak would comprise 80% of the market for the chemicals and paper used to develop and print photos.

90.     By 1988, the Company had grown to over 145,300 employees world-wide.  The Company also developed a reputation with respect to its employees.  Going to work for Kodak was known as "taking the life sentence" and it became a rite of passage for generations of employees.

91.     Kodak was one of the original 100 companies listed on the Dow Jones and the Company's stock topped $94 per share in 1997.

**B.     The Beginning of Kodak's Downward Spiral**

92.     By the 1980s, Kodak's near monopoly on color-film sales was eroding.  Although the Company still had nearly two-thirds of color-film sales worldwide, Kodak's strict adherence to its traditional business caused the Company to lag in entering new business areas – such as point-and-shoot 35mm film and single use cameras.

93.     Moreover, Fuji started to sell film at prices well below Kodak's price point for similar film.  Further eroding Kodak's market share was the fact that Fuji sold its film to rapidly growing mass merchandisers such as Wal-Mart Stores, Inc.

94.     In January of 1999, Kodak took a $350 million charge when it laid-off 3,500 employees after reporting a 24% plunge in revenue.  For the entire year, Kodak took a $1.2 billion charge and laid-off 19,900 employees.

95.     As the Company entered the new millennium, Kodak was ranked by Interbrand as the 16th most valuable brand in the world and estimated its worth at $14.8 billion.  Its stock at this time was trading at over $66 per share.

96.     As a result of Kodak's belated efforts to adjust to consumer preferences of digital photography, the Company has steadily lost value and rank as customers equated the Company's brand as outdated technology.

97.     By 2004, Kodak's downward spiral was in full-effect.  Evincing this decline, the Company was removed from the basket of 30 stocks comprising the Dow Jones Industrial Average.

98.     To combat its decline, Kodak began a four-year turnaround plan aimed at transforming the Company into a supplier of digital photography products and printers.

99.     Unfortunately, there is little hope of new products saving Kodak.  Presently, the Company spends only 4.5% of its revenue on research and development ("R&D").  This pales in comparison to the percentages spent on R&D by some of Kodak's top competitors.  For instance, Fujifilm spends 7.5% and Canon spends 8.5% on R&D.

100.    During this business transition, Kodak incurred billions of dollars in losses, instituted steep cuts to its workforce (eliminating approximately 50% of its employees) and eliminated its dividend.

101.    Business Week released an ominous article detailing the depths of Kodak's problems in October 2005.  The article: (a) noted that Kodak was "barely breaking even" on the sale of its digital cameras; (b) quoted senior executives at the Company conceding that the company's balance sheet is "stressed"; (c) detailed how emerging markets had completely skipped over the film industry and moved right into the digital market – undermining Kodak's business strategy of having emerging markets compensate for falling film sales in the United States; and (d) detailed how the Company's Board of Directors was reorganizing Kodak to

prepare for a possible sale of Company assets.  *See BusinessWeek, A Tense Kodak Moment,* October 17, 2005, http://www.businessweek.com/magazine/content/05_42/b3955106.htm.

C.      **Kodak Becomes An Imprudent Investment**

102.    Since 1999, Kodak has lost **approximately 99% of its value** – a one-time blue chip stock valued at over $80 per share was hovering at a share price of about $1 in November 2011, and was trading on the pink sheets by the middle of January 2012.

103.    Further, since Defendant Antonio Perez became Chief Executive Officer ("CEO") of Kodak in 2005, the Company has had only one year of profitability and lost money every year since 2008.

104.    Moreover, by the start of 2010, Kodak had ceased production of all but a few of its photo films and failed to establish a firm foothold in the high-end digital camera market.  The result was rapidly declining sales, falling share prices, ballooning quarterly losses and the onslaught of dire financial straits for the once iconic Company.[1]

105.    The start of the Class Period in January 2010 began with a thud as Kodak announced a loss of $232 million, or $0.87 per share, for 2009.

106.    When Kodak announced its first quarter results for 2010 in April, the Company stated that it expected overall revenue growth of 0%-1% for the full year.  Ominously, Kodak reported a 14% decline in sales from the Film, Photofinishing and Entertainment Group for the first-quarter of 2010.

107.    By the close of the fourth-quarter of 2010, the Company reported a stunning **95% drop in profits**.

---

[1]  The first day of trading, January 4, 2010, Kodak was trading at $4.26 per share.  As of November 15, 2011, the stock had fallen to $1.16 per share – **losing some 73% of its value**.  By January of 2012, the Company's stock was delisted from the New York Stock Exchange.

108.    Due to declining revenue in its traditional business lines, Kodak embarked on a business model of intellectual property licensing and lawsuits to fund its cash needs.

109.    Since 2008, Kodak has raised nearly $2 billion in licensing fees.

110.    However, even this business model was showing signs of fatigue by the start of the Class Period.  For example, in the first nine months of 2010, the Company raised only $760 million in revenue from licensing fees.

111.    Moreover, the Company was becoming increasingly dependent on intellectual property transactions to support the Company.  For example, in the first quarter of 2010, Kodak reported earnings from operations in the Consumer Digital Imaging Group of $415 million, an increase of $572 million from the same quarter in 2009.  However, excluding the completion of a previously announced intellectual property transaction, earnings improved by only $22 million.

112.    By the fourth-quarter of 2010, Kodak was blaming its 25% drop from year earlier results in digital revenue on lower intellectual property licensing revenues and industry-related pricing pressures.

113.    By 2011, this business model had utterly failed.  For instance, in the first six months of 2011, Kodak collected only $27 million in patent-licensing fees.

114.    The Company's traditional revenue streams were also drying up.  Kodak began 2011 by announcing dismal results.

115.    On January 26, 2011, Kodak announced that its revenue fell to $1.93 billion.  This was in stark contrast to analysts' expectations of $2.11 billion in revenue.  Even more startling, Kodak announced that its digital revenue fell 25% and its consumer digital imaging group (which includes Kodak's licensing portfolio) fell nearly 40%.

116.    Due to these dismal results, and reports that the U.S. International Trade Commission would rule that Kodak's patent infringement claims against Apple and Research In Motion were "invalid," Kodak had the inauspicious distinction of back-to-back double digit declines.

117.    On Tuesday, January 25, 2011, the Company's stock fell 13.4% to close at $4.52 per share.  On Wednesday, January 26, 2011, Kodak stock fell nearly 18%.

118.    Shannon Cross, a research analyst at Cross Research, stated that Kodak's "results reflect negative trends in the underlying business…"  Cross Research had a "sell" rating on Kodak.

119.    In April 2011, Kodak announced its first-quarter results.  Kodak continued its longstanding trend when it announced a quarterly loss.  Unfortunately, Kodak's quarterly loss was larger than expected with its film business revenue declining by some 14%.  Overall, Kodak reported a loss from its continuing operations of $249 million, or $0.92 per share.  A year earlier, Kodak reported profits of $119 million, or $0.40 per share.  News of these results sent Kodak's shares tumbling some 10%.

120.    On July 26, 2011, Kodak announced its second-quarter results for 2011.  Losses from continuing operations increased to $179 million or $0.67 per share, up from a loss of $167 million or $0.62 per share a year earlier.  In addition, revenue fell 5% to $1.49 billion.

121.    Further eroding the Company's ability to continue as a going concern, Kodak was burning through cash at an astonishing rate.  For instance, in January 2011, the Company had $1.6 billion in cash.  Six months later, it had less than $960 million in cash left in its coffers.

122.    By the end of June 2011, Kodak had liabilities that exceeded its assets by $1.4 billion.  Moreover, Kodak's share price **has lost over three-quarters of its value since the start of 2011**.

123.    To sustain operations, Kodak announced a strategy whereby it intended to sell parts of its 1,100 patent portfolio off to generate cash.  It was estimated that Kodak's patent portfolio was worth more than the Company itself.

124.    Some analysts forecast the Company's patent portfolio to be worth approximately $3 billion – as the technologies are used in 85% of all digital cameras and smartphones.

125.    In August 2011, investment bank Lazard Ltd. began marketing Kodak's patent portfolio.

126.    That same month, Kodak stock was trading below $2 per share; a price it had not traded at since the early 1950s.

127.    Kodak's patent sale strategy has recently been called into question.  Patent expert Alexander Poltorak told TheStreet.com that valuable patents are typically sold between $200,000 and $250,000 each, which could mean that Kodak's patent sale could garner upwards of $250 million.  *See* TheStreet.com, *Apple, Google, RIMM: Kodak's Patent Buyers*, October 10, 2011, www.thestreet.com/print/story/11272680.html.

128.    Importantly, Poltorak's estimated value of the Kodak's patent portfolio is well below the approximately $3 billion analysts valued the portfolio.

129.    Moreover, according to Poltorak, the value of Kodak's patent portfolio could be even lower than this low estimate if Kodak has exhausted the patents' value – *i.e.*, Kodak has already marketed most of the patent's license.  Further, Kodak's CEO Perez has stated publicly that he only wants to sell "the part of the portfolio that does not apply to the core investments

and the future of the company." *See* TheStreet.com, *Apple, Google, RIMM: Kodak's Patent Buyers*, October 10, 2011, www.thestreet.com/print/story/11272680.html.

130.    Even more disconcerting, Kodak's patent portfolio sale has compared to the patent portfolio sale the telecommunications company Nortel engaged in.   Nortel's sale, however, was not consummated until after Nortel filed for bankruptcy.

131.    In April 2011, Kodak entered into an agreement for a new credit facility of up to $400 million.

132.    In September 2011, facing declining liquidity, the Company tapped a $160 million line of credit to pay "for general corporate purposes."

133.    On Tuesday, September 27, 2011, Moody's downgraded Kodak's credit rating.

134.    The following day, Fitch also downgraded Kodak's credit rating to a CC level, a level indicative of "default of some kind appears probable."   In issuing its downgrade, Fitch indicated that there was an "insufficient" scale in Kodak's purported growth areas including consumer and commercial printing – the key portion of Kodak's turnaround effort.

135.    The price of Kodak stock plunged again when it was disclosed that the Company had hired the law firm Jones Day, a renowned bankruptcy firm, for restructuring advice. Unfortunately for employees invested in Kodak's ESOP, Jones Day also advises companies on seeking relief from creditors to forgive debt in exchange for ownership stakes in a company.

136.    Trading of Kodak stock was temporarily halted on Friday, September 30, 2011, due to the precipitous decline in its share price.  **In a single day alone, Kodak lost over 50% of its value before trading was halted**.

137.    The bond market has indicated that it believes that Kodak has a high risk of default.  For example, one of Kodak's bonds, with a maturity date of 2013, was trading in the

Fall of 2011 at 26 cents on the dollar, down from 76.5 cents only a week earlier.  *See Kodak Seeks Help as Fears Mount*, The Wall Street Journal, October 1, 2011, http://online.wsj.com/article/SB10001424052970204138204576603053167627950.html.

138.    Bondholders of Kodak's debt have reportedly hired the Blackstone Group as a financial advisor and have retained the law firm Akin Gump Strauss Hauer & Feld in an effort to influence how the Company handles any potential restructuring.

139.    Numerous analysts adjusted their rating of the stock to "sell."

140.    In October 2011, Citi analyst Richard Gardner reiterated his "sell" rating for Kodak.  In issuing his report, Gardner stated that Kodak's "recent withdrawal of $160M from its line of credit provides evidence of the company's inability to monetize its IP portfolio."  *See Kodak: Citi Says Sell, IP Goals Slipping*, Barron's, October 6, 2011, http://blogs.barrons.com/techtraderdaily/2011/10/06/kodak-citi-says-sell-revenue-target.

141.    On November 3, 2011, Kodak warned that its survival over the next year hinged on its ability to either sell its patent portfolio or raise cash through selling bonds.

142.    Kodak's long time supporter, Bill Miller of Legg Mason Capital Management, announced on November 10, 2011, that he had sold all of his Kodak stock.  Notably, at the beginning of 2011, Legg Mason owned 32 million shares of Kodak stock and was the largest institutional investor in Kodak stock.[2]  *See Bill Miller Is Done Losing Money on Kodak*, November 10, 2011, http://blogs.wsj.com/deals/2011/11/10/bill-miller-is-done-losing-money-on-kodak/.

---

[2] Legg Mason sold some 11 million shares of Kodak stock in the third quarter of 2011, and sold the remaining 7.9 million shares in October of 2011.  *See Bill Miller Is Done Losing Money on Kodak*, November 10, 2011, http://blogs.wsj.com/deals/2011/11/10/bill-miller-is-done-losing-money-on-kodak/.

143.   According to the Company's Definitive Proxy Statement, filed with the SEC on March 30, 2011, the 32 million shares Legg Mason Capital Management previously held represented over 12% of the Company's total outstanding shares.

144.   In 2011, Kodak has lost money ever quarter.  Even more depressing is the fact that the Company has lost money in nine of the last twelve quarters and has posted only one annual profit since 2004.

145.   Indicative of the Company's collapse, in the early 1980s the Company employed over 60,000 employees in its hometown of Rochester, New York, making it the town's largest employer.  Now, the Company has only approximately 7,100 employees and is no longer even one of the top three employers in Rochester.

146.   A photography professor at Ryerson University in Toronto, Robert Burley, recently described Kodak's demise as a "train wreck" occurring over the last five years.  *See In Kodak's troubles, a snapshot of an icon's fall*, October 5, 2011, http://finance.yahoo.com/news/In-Kodaks-troubles-a-snapshot-apf-3263086625.html?x=0.

**D.**   **Notwithstanding Kodak's Collapse, Defendants Encouraged Plan Participants To Remain Invested In Kodak Stock**

147.   In response to Kodak's dismal performance, on September 29, 2011, Kodak employees received a letter from the Company's CEO, Antonio Perez.  One Kodak employee described the message from the CEO as "just telling us to hang in there."  *See Kodak employee shares his concerns with News 10NBC*, http://www.whec.com/news/stories/s2308500.shtml.

148.   Mr. Perez has also been known to tell employees not to "lose the race" and to "keep running."  *See Kodak Struggles to Find Its Moment,* The Wall Street Journal, August 11, 2011, http://online.wsj.com/article/SB10001424053111903454504576488033424421882.html.

149.    In an attempt to ease employees' fears of Kodak's impending demise, the Company's CEO Antonio Perez held a town hall meeting with employees.  The meeting was broadcast to all of the Company's employees.  In the meeting, Perez told employees that the Company had no intention of filing for bankruptcy.

150.    Further, when Kodak announced that its survival was in jeopardy in November 2011, Perez told analysts that "[t]hese required statements shouldn't be misunderstood in any way as dampening of my optimism in our ability to complete the sale of our digital-imaging patent portfolio, which is very high."  *See Kodak posts wider loss, warns on prospects*, November   3,   2011,   http://finance.yahoo.com/news/Kodak-posts-wider-loss-warns-apf-3067669817.html?x=0.

151.    Further, in a November 3rd memo to the Company's employees, Perez told employees "[i]f I could write the headlines for the Kodak news stories that will appear today, I'd write this: Kodak Makes Steady Progress in Digital Transformation During Challenging Times." *See Squeeze Tightens on Kodak*, The Wall Street Journal, November 4, 2011, http://online.wsj.com/article/SB10001424052970203716204577015531999097686.html.

**E.    Defendants Knew or Should Have Known That Kodak Common Stock Was An Imprudent Investment For The Plans, Yet Failed To Protect the Plans' Participants**

152.    During the Class Period, although they knew or should have known that the Company's stock was an imprudent investment for the Plan, Defendants did nothing to protect the heavy investment of Plans' participants' retirement savings in Kodak stock.

153.    As a result of the enormous erosion of the value of Kodak's stock, the Plans' participants, the retirement savings of whom were heavily invested in Kodak stock, suffered unnecessary and unacceptable losses.

154.     Because of their high ranking positions within the Company and/or their status as the Plans' fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

155.     Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company stock price would suffer and devastate participants' retirement savings as the truth became known and the Company's condition worsened.  Yet, Defendants failed to protect the Plans and their participants from entirely foreseeable losses.

156.     Rather, during the Class Period, despite its obligation to prudently manage the Plans' assets -- including the Plans' heavy investment in Kodak stock -- the Defendants failed to disclose the dire circumstances surrounding the Company's true financial condition, thereby precluding Plans' participants from properly assessing the prudence of investing in Company stock.

157.     As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plan's investment in Kodak stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

158.     In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Kodak stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding

Kodak's problems so that participants -- to the extent that they were permitted -- could make informed decisions regarding whether to include Kodak stock in their Plans' accounts.

159.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Kodak stock was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

160.    Because Defendants knew or should have known that Kodak was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their  participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Kodak stock.

161.    Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plans of Kodak stock; discontinuing further contributions to and/or investment in Kodak stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by Kodak they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Kodak stock.

162.    Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plans' investment in Kodak stock.  In fact, Defendants continued to invest and to allow investment of the Plans' assets in Company stock even as Kodak's problems came to light.

**F.      At Least Certain of the Defendants Suffered From Conflicts Of Interest**

163.    Kodak's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a portion of certain officers' and Board of Directors' compensation was in the form of stock awards.  *See* Kodak Definitive Proxy Statement, filed with the SEC on March 30, 2011, at 31.

164.    Indeed, as of March 2011, the Director Defendants and SIPCO Defendants Sklarsky and McCorvey combined held over 4.2 million shares of Kodak common stock, representing well over 1% of the total outstanding shares of the Company.  *Id.*

165.    Because the compensation of at least some of the Defendants was significantly tied to the price of Kodak stock, at least certain of the Defendants had incentive to keep the Plans' assets heavily invested in Kodak stock on a regular, ongoing basis.  Elimination of Company stock as an investment option/vehicle for the Plans would have reduced the overall market demand for Kodak stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of Kodak, resulting in reduced compensation for at least certain of the Defendants.

166.    Some Defendants may have had no choice in tying their compensation to Kodak stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plans' participants' and beneficiaries' retirement savings tied up to a large extent in Kodak stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

167.    These conflicts of interest put certain Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plans' participants and beneficiaries, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plans.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52, 124 L.

Ed. 2d 161, 113 S. Ct. 2063 (1993); *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 309 (3d Cir. 2008); 29 U.S.C. § 1104(a)(1)(B).

**G.**   **ERISA § 404(c) Defense Inapplicable**

172.   ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.   In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

173.   ERISA § 404(c) does not apply here for several reasons.   First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Kodak stock as an investment option in the Plans, or to continue matching in Kodak stock as these are not decisions that were made or controlled by the participants. Second, ERISA § 404(c) does not apply to any Company stock in the Plans over which the participant did not have even nominal control, such as the employer match and dividends. Third, even as to participant-directed investment in Kodak stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Kodak stock.   As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Kodak stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that resulted from such investment.   Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plans, Plaintiff and the Class for losses caused by the Plans' investment in Kodak stock is established upon proof that such

investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

174.    Finally, 404(c) does not apply to the ESOP, as that plan had a single investment vehicle – Kodak stock.

## H.    Plaintiff Is Not Obligated to Exhaust Administrative Remedies

175.    Plaintiff claims breach of fiduciary duty under ERISA §§ 404 and 405, 29 U.S.C. §§1104 and 1105, for which he is entitled to damages under ERISA § 409, 29 U.S.C. § 1109. ERISA claims based on statutory rights, such as the claims here, are distinguished from claims based on "benefits due" or other contractual rights under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

176.    An ERISA participant may "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" under ERISA § 502(a)(1), 29 U.S.C. § 1132(a)(1).  Subject to some exceptions, a plaintiff wanting to recover benefits due or enforce rights regarding plan benefits must exhaust available administrative remedies before suing under ERISA § 502(a)(1).  Thus, all United States Circuit Courts have uniformly required plaintiff to exhaust administrative remedies before bringing suit in federal court to obtain benefits.

177.    However, no provision of ERISA expressly or implicitly requires a participant to exhaust administrative remedies before that participant may bring a fiduciary breach claim in federal court for losses to the plan.

178.    Because Plaintiff is not seeking to recover benefits due under the Plans, but rather is petitioning this court to remedy breaches of fiduciary duty owed by Defendants to the Plans, it is neither necessary nor useful for Plaintiff to exhaust administrative remedies in this case.

180.   Under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiff seeks to enforce, pursuant to ERISA § 409, 29 U.S.C. § 1109, Defendants' "personal [] liabil[ity] to make good to [a] plan any losses to the plan resulting from [the breach of fiduciary duty]."  Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff can "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . obtain other appropriate equitable relief. . . ."

181.   Plaintiff alleges that Defendants' breaches of fiduciary duty have caused the Plans to lose tens of millions of dollars.  Given the extent of the Defendants' liability, it is certain that the relief Plaintiff seeks will not be provided through the Plans' administrative processes. Moreover, the Plan Administrators are not going to order themselves or any of the other Defendants to pay millions of dollars to the Plans or seek a declaratory judgment to this effect, so any appeal to them would be futile.

182.   Finally, even if the Plan Administrators were to order the monetary relief sought, the individual Defendants' assets may be inadequate to satisfy such an order.  Plaintiff's attempt to obtain any such order would be futile.

## CAUSATION

183.   The Plans suffered tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, as  reflected in the diminished account balances of the Plans' participants.

184.   Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and the Plans' participants would have avoided a substantial portion of the losses that they suffered through the Plans' continued investment in Kodak stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

185.   As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

186.   ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

187.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

188.   Plaintiff, the Plans, and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs and interests on these

amounts, as provided by law; and (e) such other legal or equitable relief as may be just and proper.

## CLAIMS FOR RELIEF UNDER ERISA

189.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

190.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

191.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

192.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

193.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982).  They entail, among other things:

(a)     A duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)     A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)     A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

194.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

195.   Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLANS' ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND § 405 BY ALL DEFENDANTS)**

196.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

197.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

198.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Kodak's stock in the Plans were prudent and that such investment was consistent with the purpose of the Plans.  Defendants are liable for losses incurred as a result of such investments being imprudent.

199.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

200.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plans or their assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plans investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans.

201.    Defendants breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period, Defendants knew or should have known that, as described herein, the Kodak common stock was not a suitable and appropriate investment for the Plans. Investment in Company stock during the Class Period clearly did not serve the Plans' stated purposes.  Yet, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plans' participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

202.    Defendants further breached their duties of loyalty and prudence by failing to divest the Plans of Kodak stock when they knew or should have known that it was not a suitable and appropriate investment for the Plans.

203.    Defendants further breached their duties of loyalty and prudence by failing to ensure that participants liquidated their investments in Kodak stock and transferred the sale proceeds to the investment options available in the Plans.  With actual or constructive knowledge that Plans' participants did not have full and complete information about the Company's

problems, and thus were unable to make fully informed decisions about whether to retain their holdings in Company stock, Defendants had the fiduciary obligation to either inform the Plans' participants of the need to take action to protect their financial interests or, if necessary, to liquidate the Plans' holdings of Company stock on participants' behalf to ensure that they did not suffer a financial loss.

204.   Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans even as the Company spiraled towards bankruptcy.

205.   Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.  Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

206.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries lost a significant portion of their retirement investment.  Had Defendants taken appropriate steps to

comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plans.

207.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and for the relief requested below.

## COUNT II

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE DIRECTOR DEFENDANTS)

208.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

209.    At all relevant times, as alleged above, the Director Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

210.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, SIPCO and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

211.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, the Director Defendants, had the duty to:

(a)     Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

(b)      Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)      Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(d)      Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)      Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investments; and

(f)      Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

212.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and the plan's assets.

213.   The Director Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries completely

40

appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.   The Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were: (a) continuing to invest the assets of the Plans in Kodak common stock when it no longer was prudent to do so; and (b) imprudently allowing the Plans to continue offering Kodak stock as an investment alternative.  Despite this knowledge, the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

214.    In addition, the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Kodak that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

215.    The Director Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

216.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

217.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and for the relief requested below.

## COUNT III

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY ALL DEFENDANTS, EXCLUDING SIPCO)

218.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

219.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plans within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

220.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

221.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in the Company's securities.

222.    As a consequence of Defendants' breaches of fiduciary duty, the Plans suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

42

duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

223.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully prays for relief as follows:

A.    a declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and the Plans' participants;

B.    a declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    an order compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits that the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.    actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      an order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Kodak maintained by the Plans in proportion to the accounts' losses attributable to the decline in Kodak's stock price;

G.      an order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      an order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.      an order for equitable restitution and all other appropriate equitable and/or monetary relief against Defendants.

## JURY DEMAND

Plaintiff hereby demands a jury on all issues so triable.

January 31, 2012                                    Respectfully,

                                                    BLITMAN & KING LLP

                                                    By: /s Jules L. Smith
                                                        Jules L. Smith
                                                    The Powers Building, Suite 500
                                                    16 West Main Street
                                                    Rochester, New York 14614
                                                    Telephone: (585) 232-5600
                                                    Facsimile:   (585) 232-7738
                                                    Email: jlsmith@bklawyers.com

                                                        —and—

                                                    Todd S. Collins
                                                    Shanon Carson
                                                    Berger & Montague, P.C.
                                                    1622 Locust Street
                                                    Philadelphia, PA 19103
                                                    Telephone: (215) 875-3000
                                                    Facsimile:   (215) 875-4604
                                                    Email: tcollins@bm.net
                                                            scarson@bm.net

                                                    Attorneys for Plaintiffs